EVAN BARENBAUM, ESQ.
Email: ebarenbaum@sterneisenberg.com
RICHARD STERN, ESQ.
*Admitted Pro Hac Vice*
Email: rstern@sterneisenberg.com
**STERN & EISENBERG, PC**
261 Old York Road, Suite 410
The Pavilion
Jenkintown, PA 19046
Telephone:  (215) 572-8111
Facsimile:  (215) 572-7750

(ADDITIONAL COUNSEL ON SIGNATURE PAGE)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOYCE PHILLIPS, GARY MENGLE, and JOHN BAKLEY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COMCAST SPECTACOR, L.P.; PHILADELPHIA FLYERS, L.P.; PHILADELPHIA FLYERS, L.L.C.; GLOBAL SPECTRUM, LP; NHL ENTERPRISES, L.P.; JOHN and JANE DOES 1 through 10, inclusive; and ABC CO., CORP., LLC, LLP, LP 1 through 10, inclusive,<br><br>Defendants. | Civil Action No. 3:12-cv-3606-MAS-DEA<br><br>**[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Joyce Phillips, John Bakley and Gary Mengle, on behalf of themselves and all others similarly situated, by their counsel, allege as follows:

1.     Plaintiffs bring this action against Defendants Comcast Spectacor, L.P. ("Comcast"), the Philadelphia Flyers, L.P. ("Flyers, L.P."), Philadelphia Flyers, L.L.C. ("Flyers, L.L.C.") and Global Spectrum, L.P. ("Global") (collectively, the "Flyers Defendants"), and NHL Enterprises, L.P. ("NHL Enterprises" or "Defendant NHL Enterprises") (collectively

"Defendants"), individually and on behalf of all purchasers of the professional Philadelphia Flyers hockey club ("Flyers") Full Season Ticket Package for the 2011-2012 season and who suffered damages as a result of the acts alleged herein.

## JURISDICTION AND VENUE

2.     This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2) and (6).

3.     The Court has personal jurisdiction over each Defendant as each Defendant has substantial contacts with this District through its systematic and continuous conducting of business in this District and throughout the United States, including marketing, advertising, and sales directed to people and businesses in the class jurisdiction.

4.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c) and (d) because a substantial part of the events giving rise to the Amended Complaint occurred in this District, and one or more of the Defendants reside, transact business and/or are found within this District.

## AVERMENTS APPLICABLE TO ALL COUNTS

## THE PARTIES

### *Plaintiffs*

5.     Plaintiff Joyce Phillips is, and at all times relevant to this action has been, a New Jersey resident.

6. During the Class Period – which, for purposes of this action is defined as the period from January 1, 2011 through the date the initial complaint was filed – Plaintiff Phillips purchased a Full Season Ticket Package for the Philadelphia Flyers 2011-2012 season. As a direct and proximate result of Defendants' conduct, Plaintiff Phillips has been economically injured and has suffered ascertainable losses.

7. Plaintiff John Bakley is, and at all times relevant to this action has been, a New Jersey resident. During the Class Period, Plaintiff Bakley purchased a Full Season Ticket Package for the Philadelphia Flyers 2011-2012 season.

8. As a direct and proximate result of Defendants' conduct, Plaintiff Bakley has been economically injured and has suffered ascertainable losses.

9. Plaintiff Gary Mengle is, and at all times relevant to this action has been, a Pennsylvania resident. During the Class Period, Plaintiff Mengle purchased a Full Season Ticket Package for the Philadelphia Flyers 2011-2012 season.

10. As a direct and proximate result of Defendants' conduct, Plaintiff Mengle has been economically injured and has suffered ascertainable losses.

### *Defendants & Affiliated Entities*

11. Defendants are Philadelphia-based sports and entertainment companies. One, some, or all of the Defendants own the Flyers, are affiliated with the Flyers or participated in the acts alleged herein so as to make them liable for the complained of acts.

12. Defendants' parent company is Comcast Corporation, the broadcasting and telecommunications giant.

13. Defendant Comcast is organized and exists under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Philadelphia, Pennsylvania.

14. Comcast engaged in some or all of the actionable conduct alleged herein.

15. Comcast trades as the "Philadelphia Flyers" and is the registered owner of the fictitious business name, "Philadelphia Flyers."

16. Comcast is identified in the Constitution of the National Hockey League ("NHL") and elsewhere -- and is, therefore, believed to be -- the owner of the Philadelphia Flyers hockey club which holds the exclusive NHL franchise for the territory that includes the City of Philadelphia and parts of the Commonwealth of Pennsylvania and State of New Jersey.

17. Bryn Mawr Realty Corp., a Pennsylvania corporation, is the managing General Partner of Comcast. Comcast Spectacor Holding Company, Inc. is a General Partner of Comcast.

18. Defendant Flyers, L.P. is a limited partnership organized in the State of Delaware with registered offices located in Philadelphia, Pennsylvania. Flyers, L.P., upon information and belief, is believed to have engaged in all or some of the actionable conduct alleged herein and has been represented by the Defendants to be the owner of the Philadelphia Flyers hockey club, despite the terms of the NHL Constitution and the Defendants' public pronouncements and representations indicating that Comcast owns the Philadelphia Flyers Hockey Club.

19. Defendant Flyers, L.L.C. is a limited liability company and is listed as a general partner of Flyers, L.P.

20. Upon information and belief, it is registered in the State of Delaware. Flyers, L.L.C., upon information and belief, is believed to have engaged in some or all of the actionable conduct alleged herein.

21.     Defendant Global Spectrum, L.P. ("Global") is a limited partnership whose principal offices are located in Philadelphia, Pennsylvania and the majority interest of which is owned by Comcast.

22.     Global operates and manages sports and entertainment facilities in the United States and Canada, including the Wells Fargo Center, Citizens Bank Park, and a facility or facilities in New Jersey.

23.     Global is registered as a foreign limited partnership in the State of New Jersey. Global engaged in some or all of the actionable conduct alleged herein.

24.     The above Defendants are, upon information and belief, entities which are affiliated with each other and are under common ownership and/or control and are sometimes hereinafter referred to as the "Flyers Defendants."

25.     Defendant NHL Enterprises, L.P. ("NHL Enterprises") is a foreign limited partnership that engages in merchandising and licensing programs.  It is organized in Delaware with its headquarters located in New York.

26.     NHL Enterprises engaged in some or all of the actionable conduct alleged herein.

27.     Defendants John and Jane Doe 1-10, inclusive, and ABC Co., Corp., LLC, LLP, LP 1-10, inclusive, are fictitious names of persons and entities whose identities are currently unknown to Plaintiffs and are not reasonably identifiable at this time but who, during the course of discovery, may become known as persons or entities who are legally responsible for some or all of the conduct alleged herein and may thereafter be individually named as defendants.

28.     Defendants entered into a real agreement or confederation with a common design to perpetrate the actions alleged herein and/or they acted in concert with one another to

perpetrate the actions against Plaintiffs and members of the Class, including the sub-classes hereinafter described.

29.     Defendants entered into said agreement or confederation in furtherance of an unlawful purpose or a lawful purpose to be achieved by unlawful means or acted in concert with one another in furtherance of an unlawful purpose or a lawful purpose to be achieved by unlawful means.

30.     As a direct and proximate result of Defendants' concerted misconduct, Plaintiffs and members of the Class sustained damages and ascertainable losses.

31.     Each Defendant named in the Amended Complaint is equally and vicariously liable to Plaintiffs and the Class for the damages proximately caused to Plaintiffs by any act or omission of one or more of the Defendants done in furtherance of the conspiracy.

## FACTUAL ALLEGATIONS

32.     Defendants Comcast and Flyers L.P. sell, and at all times relevant to this action sold, tickets to Flyers hockey games to the public.

33.     Each year Defendants Comcast and Flyers L.P. solicit Flyers season ticket holders from previous seasons to again purchase Flyers Full Season Ticket Packages prior to the start of the upcoming NHL season.

34.     The purchasers of the Flyers Full Season Ticket Packages are among the most faithful, loyal and supportive of Flyers fans.

35.     The purchasers of Flyers Full Season Ticket Packages financially support the Defendants by paying or committing to pay for, either in one lump sum or installments, usually by credit card, their season tickets before the season begins.

36.     Season ticket holders purchase their tickets without knowing whether the Flyers will have a winning season.

37.     Based on the Flyers Defendants' knowledge of the identity of the Flyers' full season ticket purchasers from the 2010-2011 season and  earlier seasons, Flyers Defendants offered those same purchasers the opportunity to purchase Flyers Full Season Ticket Packages for the then upcoming 2011-2012 season.

38.     The 2011-2012 Full Season Ticket Package advertised and offered to Plaintiffs and members of the Class was comprised of tickets to forty-four (44) Flyers games, which consisted of forty-one (41) regular season home games and three (3) preseason home games (the "Full Season Ticket Package").

39.     The Flyers Defendants also offered to the general public the opportunity to purchase a variety of partial season ticket packages, none of which, upon information and belief, offered a ticket to the January 2, 2012, Flyers – NY Rangers game.

### *The Agreement*

40.     In or about March 2011, the Flyers Defendants sent Plaintiff Phillips a form invoice to sell her a Full Season Ticket Package for a total cost of approximately $4,180, plus a $10 "processing" charge.

41.     In or about March 2011, the Flyers Defendants sent Plaintiff Bakley a form invoice to sell him two Full Season Ticket Packages for a total cost of approximately $4,400, plus a $10 "processing" charge.

42.     In or about March 2011, the Flyers Defendants sent Plaintiff Mengle a form invoice to sell him two Full Season Ticket Packages at a total cost of approximately $5,114, plus a $10 "processing" charge.

43.     All members of the Class received from the Flyers Defendants and accepted a substantially similar invoice offer (the form invoices varied only with respect to the identity of the class member, the number of Full Season Ticket Packages sold to the class member, seat location(s), charges for parking and other optional amenities, and the total cost of the Full Season Ticket Package(s)).

44.     The Flyers Defendants' invoice offers were accepted by Plaintiffs and the Class members and the offers and acceptances are referred to herein as the "Agreement."

45.     Each of the Plaintiffs and Class members accepted the terms of the Flyers Defendants' invoices by purchasing at least one (1) Full Season Ticket Package.

### *Season Ticket Package and the Winter Classic*

46.     In early September 2011, Plaintiffs and the members of the Class received bound ticket books from the Flyers Defendants which, except as stated below, were comprised of a "tear-away" individual ticket for each preseason and regular season Flyers home game.

47.     In return for purchasing the forty-four (44) game tickets that the Flyers Defendants promoted as the Full Season Ticket Package, Plaintiffs and each member of the Class should have received ticket books containing forty-four (44) tickets – one for each of the Flyers' preseason and regular season home games.

48.     However, Plaintiffs and other Class members did not receive a ticket for the regular season home game scheduled for January 2, 2012, against the New York Rangers hockey club ("NY Rangers").

49.     Instead, the ticket books contained only forty-three (43) tickets, and a mock ticket for the January 2, 2012 regular season home game against the NY Rangers, described on the mock ticket as the "Winter Classic."

50.     The game scheduled for January 2, 2012, between the Flyers and the NY Rangers was a regular season home game in the official NHL schedule for the 2011-2012 season.

51.     The result of the Winter Classic game was counted by the NHL, Flyers and NY Rangers for the purpose of determining season point standings and playoff seeding.

52.     Upon delivery of the season ticket books, the Flyers Defendants notified Plaintiffs and members of the Class for the first time that they received only forty-three (43) tickets and not the forty-four (44) tickets that they were offered and had purchased.

53.     The January 2, 2012, home game against the NY Rangers which became the Winter Classic game was omitted from the ticket books.

### The Winter Classic

54.     Immediately after the preceding 2011 Winter Classic, the Defendants, including NHL Enterprises knew that one of the NHL's hockey teams would host the 2012 Winter Classic.

55.     Immediately after the preceding 2011 Winter Classic, Defendants knew or had reason to know that the Flyers would host the 2012 Winter Classic.

56.     As early as January 2011, if not earlier, Defendants commenced discussions with the president of the Philadelphia Phillies baseball team to hold the 2012 Winter Classic at Citizens Bank Park.

57.     As early as April 2011, if not earlier, Defendants held meetings regarding the Winter Classic and attendant events.

58.     Prior to offering to sell to Plaintiffs and members of the Class, the Flyers Defendants and Defendant NHL Enterprises were negotiating an agreement for the Flyers to host the Winter Classic.

59.     The Defendants executed their agreement on August 10, 2011 ("NHL Enterprises-Flyers Agreement").

60.     As of the time the Flyers Defendants began printing the tickets for the Full Season Ticket packages to send to Plaintiffs and members of the Class in or about May 2011, the Flyers Defendants and Defendant NHL Enterprises already had an agreement in principle to participate in the Winter Classic.

61.     Defendant NHL Enterprises and the Flyers Defendants held a joint press conference announcing that the January 2, 2012 game between the Flyers and the NY Rangers would be called the "Winter Classic."

62.     The Flyers' preseason and regular season home games are ordinarily scheduled by Defendants to be played at the Wells Fargo Center in Philadelphia.

63.     Upon information and belief, the Wells Fargo Center has a 19,537 seating capacity for ice hockey games.

64.     Of the 19,537 seats available at the Wells Fargo Center, approximately 13,681 are sold as part of the Full Season Ticket Package.

65.     Prior to offering to sell to Plaintiffs and members of the Class the Full Season Ticket package, the Flyers Defendants had an agreement in principle with Defendant NHL Enterprises and the owners or operators of Citizens Bank Park to move the January 2, 2012 regular season home game against the NY Rangers to Citizens Bank Park.

66.     Citizens Bank Park is located adjacent to the Wells Fargo Center.  Citizens Bank Park is the home ball park of Major League Baseball's Philadelphia Phillies franchise.

67.     Citizens Bank Park has a larger seating capacity of approximately 46,967 seats for baseball games.

68.     Citizens Bank Park has a larger seating capacity for ice hockey than the Wells Fargo Center.

69.     By virtue of the game taking place at Citizens Bank Park, in excess of twice as many tickets were sold for the January 2, 2012 Flyers – NY Rangers game than could have been sold if the game took place at the Wells Fargo Center.

70.     The Flyers Defendants competed with other NHL club owners to host the 2012 Winter Classic in Philadelphia.

71.     Playing in the Winter Classic is considered by the Defendants to be lucrative and desirable.

72.     The Flyers Defendants lobbied Defendant NHL Enterprises for the right to host the Winter Classic.

73.     Defendants received considerable publicity as a result of hosting the Winter Classic.

74.     As one of the participants in the Winter Classic, the Flyers were part of a television special "24/7" Flyers/Rangers: Road to the NHL Winter Classic" which aired repeatedly on the Home Box Office ("HBO") channels.

75.     The 24/7 episodes were in the words of the NHL Commissioner Gary Bettman, "the talk of the sports world."

76.     Given both the tangible and intangible benefits of being on television in the HBO Special known as "24/7," the decision to participate in the Winter Classic was known to the Defendants at the time the Flyers Defendants sent out the season ticket renewals to Plaintiffs and members of the Class.

*Winter Classic Ticket Allocations*

77.     In exchange for an agreement to have the January 2, 2012 game take place at Citizens Bank Park, the Flyers Defendants received an allocation of Winter Classic game tickets.

78.     The allocation received by the Flyers Defendants was sufficient to satisfy their Agreements with Plaintiffs and members of the Class, with the exception of those members of the Class who purchased suite seating.

79.     Through the Flyers-NHL Enterprises Agreement, the Flyers Defendants purchased their allocation of tickets from Defendant NHL Enterprises at the prices set by NHL Enterprises, and the Flyers Defendants then resold those tickets to Plaintiffs and the Class at the same prices.

80.     Plaintiffs and members of the Class, pursuant to their Agreement, were entitled to the forty-fourth (44th) ticket, absent any additional conditions, stipulations or consideration, whether or not Defendants characterized the game as the "Winter Classic," and irrespective of Defendants' decision to enter into the agreements into which they entered to conduct the Winter Classic in Philadelphia and hold the game at Citizens Bank Park, a location adjacent to the Wells Fargo Center.

81.     In entering into the Flyers-NHL Enterprises Agreement, NHL Enterprises knew that the Flyers Defendants had already offered,  sold or otherwise committed to sell to Plaintiffs and members of the Class the Full Season Ticket Packages, including the ticket to the Flyers' and Rangers' January 2, 2012 game.

82.     Defendants, on the one hand, notified Plaintiffs and members of the Class that they could not provide Plaintiffs and members of the Class the forty-fourth (44th) ticket as part of the Agreement.

83. Defendants, on the other hand, notified Plaintiffs and members of the Class that they could provide them with the forty-fourth (44th) ticket, but only if they agreed to Defendants' additional terms and conditions, and pay Defendants substantially more consideration.

84. Despite Defendant NHL Enterprises' knowledge that the Flyers Defendants had agreements with Plaintiffs and the Class for Full Season Ticket Packages, including tickets to the Rangers and Flyers January 2, 2012 game, NHL Enterprises entered into the Flyers-NHL Enterprises Agreement and set the prices for the Winter Classic tickets.

85. NHL Enterprises' agreement with the Flyers Defendants for the Winter Classic resulted in the Flyers Defendants failure to perform the obligations of their Agreements with Plaintiffs and members of the Class to provide them the ticket to the Flyers-Rangers January 2, 2012 game which they had purchased as part of their Full Season Ticket Packages.

86. After Defendants agreed to take away the forty-fourth (44th) ticket from Plaintiffs and the Class, Defendants contacted Plaintiffs and members of the Class with an offer to resell back to them the forty-fourth (44th) ticket they had previously purchased, but only as part of a tied, three-ticket package consisting of the forty-fourth (44th) ticket to the "Winter Classic", as well as tickets to two unrelated games: (a) a December 31, 2011 "Alumni Game," and (b) a January 6, 2012 minor league game between the Adirondack Phantoms and the Hershey Bears.

87. The Flyers Defendants decided to package the Winter Classic ticket as part of a three-ticket package in order to secure revenue to themselves from all three events.

88. Defendants created the likelihood of confusion and misunderstanding and deceived Plaintiffs and members of the Class by concealing from Plaintiffs and members of the Class, until the Flyers Defendants received the payments and commitments to pay for the Full

Season Ticket Package from them, Defendants' intention to exclude a regular season home game ticket from the Full Season Ticket Package.

89.      With the intention of deceiving Plaintiffs and members of the Class and inducing them to purchase Full Season Ticket Packages, the Flyers Defendants expressly represented that Plaintiffs and members of the Class would receive the 44th ticket as part of the Agreement.

90.      Defendants, however, deliberately failed to disclose as part of the Agreement that they intended to exclude the 44th ticket, or any Flyers regular season home game ticket, from the Full Season Ticket Package, whether it was the Winter Classic or any other game ticket.

91.      NHL Enterprises entered into the NHL Enterprises-Flyers Agreement which required the Flyers Defendants to transfer all tickets to the January 2, 2012 Flyers home game to NHL Enterprises and provided that NHL Enterprises would set the price for the Plaintiffs and members of the Class to purchase tickets to the January 2, 2012 game that they had previously purchased.

## *The Scheme*

92.      After notifying Plaintiffs and members of the Class that the forty-fourth (44th) ticket had been taken away, Defendants, through Comcast, advised Plaintiffs and the Flyers' Full Season Ticket Package holders who comprise the nationwide Class and the New Jersey and Pennsylvania sub-classes described below, that they would be given the opportunity to purchase the forty-fourth (44th) ticket at a cost in excess of what they had already paid or committed to pay as part of the Agreement, at prices set by Defendant NHL Enterprises.

93.      Further, Defendants required Plaintiffs and the Class members to purchase the Winter Classic tickets as part of three-strip packages whereby, as a condition for purchasing the forty-fourth (44th) ticket, Plaintiffs and members of the Class were required to purchase, whether

they wanted them or not, tickets to the two non-NHL-regulation events, the December 31, 2011 exhibition Alumni Game, and the January 6, 2012 minor league game between the Adirondack Phantoms and the Hershey Bears (the "Alumni Game" and "Minor League Game," respectively).

94.    Neither the Alumni Game nor the Minor League Game featured any current Flyers player or other current NHL team member.

95.    Defendants orchestrated the three strip ticket package sales and derived additional revenues through another one of their companies, New Era Tickets, LLC, trading as ComcastTIX. Defendants directly or indirectly derived revenues from New Era Tickets, LLC.

96.    In addition to being required to purchase tickets to both the Alumni Game and Minor League Game as a condition for purchasing the Flyers–NY Rangers Winter Classic game ticket, the Full Season Ticket Package holders were also required to pay more "processing" charges.

97.    Pursuant to the Agreement, each Plaintiffs and member of the Class had already paid a flat $10 processing charge to the Flyers Defendants to purchase their season tickets, without regard to the number of Full Season Ticket Packages each had purchased.

98.    When Defendants sold the three (3) tickets that were part of the tied Winter Classic package, the Flyers Defendants required Plaintiffs and members of the Class to pay additional, substantial and unconscionable processing charges.

99.    Plaintiffs and members of the Class paid the additional fees, costs and charges demanded of them by Defendants as a condition to receiving the forty-fourth (44th) ticket.

100.    The "processing" charges were undeserved, unconscionable, excessive and unrelated to Defendants' costs to process the sale of Winter Classic tickets to Plaintiffs and the Class members.

101.    The processing charges were merely another act of deception and unfair dealing by Defendants to derive additional and unearned revenues from Plaintiffs and members of the Class in contravention of the Agreement.

102.    In furtherance of Defendants' calculated scheme and deception, in a claimed justification to refuse to provide Plaintiffs and members of the Class with the forty-fourth (44th) ticket that was part of the Full Season Ticket Package, the Flyers Defendants stated that they would give Plaintiffs and members of the Class a credit toward the purchase of Flyers playoff tickets. No other option was initially provided.

103.    The credit was equal to only one forty-fourth (1/44) of the total amount each Plaintiffs and member of the Class had paid or committed to pay for each of their Full Season Ticket Packages.

104.    To receive the benefit of the credit, Defendants required Plaintiffs and members of the Class to spend even more money and make additional ticket purchases from Defendants, in addition to paying more processing charges that Defendants collected for each ticket transaction.

105.    The limited manner in which the credit could be used by the Plaintiffs and class members was deceptive and unconscionable.

106.    At the time the credit was offered by Defendants, the Flyers had not qualified to be in the NHL playoffs and there were no assurances the Flyers would ever qualify to be in the playoffs.

107.    Defendants deceptively designed thier credit offer to leave Plaintiffs and members of the Class with no meaningful alternative other than to give Defendants hundreds of dollars

more for playoff tickets, or risk forfeiture of the credit if the Flyers did not qualify for the playoffs.

108.   As part of their efforts to deceive and mislead Plaintiffs and members of the Class, Defendants concocted a scheme that would result in the credit being forfeited to Defendants if the Flyers did not qualify for the playoffs, or if any of the Plaintiffs or members of the Class did not purchase playoff tickets.

109.   Defendants never offered to credit or refund, in whole or in part, any of the "processing charges" that Plaintiffs and members of the Class had paid as part of the Agreement.

110.   Defendants wrongfully have continued to refuse to return any of the processing charges.

111.   By initially refusing to give Plaintiffs and members of the Class a refund, and only a materially deficient credit subject to a scheme that would require Plaintiffs and members of the Class to give Defendants millions more dollars in the aggregate, or forfeit the credit, Defendants created the likelihood of confusion and misunderstanding consistent with, and in furtherance of, their illegal plot to extract millions of dollars from Plaintiffs and members of the Class.

112.   On September 30, 2011, only after receiving complaints from Full Season Ticket Holders, did Defendants disingenuously offer Plaintiffs and Class members refunds.

113.   The refund offered was, however, insufficient as it was equivalent to one forty-fourth (1/44) of the price that Plaintiffs and members of the Class had paid for each Full Season Ticket Package purchased.

114.    Both the credit and the refund offered by Defendants were materially deficient, unfair, and less than the value of the forty-fourth (44th) ticket that Defendants misappropriated and refused to turn over to Plaintiffs and members of the Class.

115.    Neither the credit nor the refund included the return of the processing charges, or any portion thereof, which Defendants wrongfully misappropriated and refused to return.

116.    In furtherance of their scheme, Defendants then offered Plaintiffs and members of the Class the right to repurchase, for additional consideration, the very same forty-fourth (44th) ticket which they originally claimed they could not provide to Plaintiffs and members of the Class.

117.    Plaintiffs and members of the Class reasonably relied upon the Flyers Defendants' representations stated in the Agreement that they would provide Plaintiffs and members of the class forty-four (44) tickets at the cost stated in the Agreement, which they agreed to pay.

118.    Plaintiffs and members of the Class were induced to enter into the Agreement based on Defendants' false promises and misrepresentations stated in the Agreement that they would provide Plaintiffs and members of the class forty-four (44) tickets.

119.    Plaintiffs and members of the Class were directly and proximately damaged by Defendants' false promise contained in their Agreement with Full Season Ticket Package holders that Defendants would deliver, in exchange for the consideration stated, forty-four (44) tickets, one for each of the Flyers' 2011-2012 preseason and regular season home games.

120.    Defendants engaged in a scheme to deceive Plaintiffs and members of the Class into paying for forty-four (44) tickets, without the intention to deliver forty-four (44) tickets, and specifically, the ticket to the January 2, 2012 Flyers–NY Rangers game. Defendants orchestrated a scam not only to require Plaintiffs and members of the Class to repurchase the forty-fourth

(44th) ticket for a price in excess of the amount already paid, but conditioned the purchase of the forty-fourth ticket on the purchase of a three-strip ticket package and provided Plaintiffs and members of the Class with an illusory credit.

121.    As neither the NHL Enterprises-Flyers Agreement, nor anything else, required the Flyers to sell the Winter Classic ticket in three-ticket strips, yet the Flyers chose to do so anyway, Defendants' scheme was designed to create a windfall for Defendants of millions of dollars in the aggregate.

122.    The forty-fourth (44th) ticket that Defendants excluded from the Full Season Ticket Package was the most valuable regular season home game ticket of the Flyers' 2011-2012 regular season.

123.    Defendants illegally and unfairly misappropriated the forty-fourth (44th) ticket for their own use, benefit and profit.

124.    In furtherance of their illegal scheme, Defendants designed and orchestrated a confusing, time-sensitive, and limited time-access "on sale" procedure for Plaintiffs and members of the Class to select and pay for the Winter Classic, Alumni Game and Minor League Game tickets, pursuant to which Plaintiffs and members of the Class were forced to act without the reasonable opportunity for thought and reflection in order to avoid forfeiting the opportunity to repurchase the forty-fourth (44th) game ticket they had previously purchased or committed to purchase.

125.    Defendants never before required Plaintiffs and members of the Class to purchase their tickets through the "on sale" medium and/or procedure.

126.    Defendants' "on sale" ticket purchase procedure created the likelihood of confusion and misunderstanding to Plaintiffs and members of the Class, that the mandatory, but

undesirable, Alumni Game and Minor League Game tickets could be purchased at lower price levels than those applicable to the Winter Classic game ticket's price levels.

127.   Defendants' "on sale" ticket procedure concealed the existence and true nature and extent of the processing charges that Plaintiffs and members of the Class would incur to purchase the three ticket package.

128.   On information and belief, an entity related to Defendants, NBCUniversal Media, LLC, had broadcasting rights to the Winter Classic, from which Defendants and/or the Flyers Defendants' corporate parent, Comcast Corporation, directly or indirectly derived revenues.

129.   On information and belief, Defendants directly derived revenue through the deal with the cable television network, HBO, by reason of the Flyers' participation in "24/7 Flyers/Rangers: Road to the NHL Winter Classic."

130.   Defendants derived revenues from "Winter Classic" merchandise, apparel sales, concessions, and a variety of sponsorship deals, licensing and vendor arrangements.

131.   Had each of the Plaintiffs and the other Class members originally received the ticket to the Flyers' regular season home game against the NY Rangers, for which they paid as part of the Full Season Ticket Package, they would have been able to attend the game without having to pay Defendants any more than they had already paid pursuant to the Agreement.

132.   Alternatively, Plaintiffs and other members of the Class would have been able to resell the forty-fourth (44th) ticket on the secondary market at a substantial profit, as Flyers ticket holders often do.

133.   Defendants regularly encouraged Plaintiffs and members of the Class to resell their tickets on the secondary market.   In fact, Defendants established the Flyers Ticket Marketplace as the "Flyers exclusive site for online resale."

134.    There is no maximum price that can be charged on the Flyers Ticket Marketplace, and Defendants pocket a 20% fee on all ticket transactions on that platform.

135.    Defendants touted the Flyers Ticket Marketplace, and the secondary market in general, as one of the attractions for Plaintiffs and other members of the Class to purchase Flyers season tickets so that they could realize economic value from reselling them at a profit.

136.    However, Defendants created the likelihood of confusion and misunderstanding and engaged in a deceptive scheme to intentionally deprive Plaintiffs and other members of the Class of the opportunity to profit and benefit from their purchase of the forty-fourth (44th) ticket that was supposed to be part of the Full Season Ticket Package.

137.    Defendants' actions, as alleged above, unfairly deprived Flyers Full Season Ticket Package holders of the significant financial benefit they would have realized by reselling the Winter Classic game ticket on the secondary market without having to pay Defendants additional consideration for the ticket.

138.    Defendants' sale of the Winter Classic game tickets was governed by the Pennsylvania Resale Amusement Ticket Law, 4 P.S. §§ 201 *et seq.* (the "Act").

139.    Although the Act permits the resale of a ticket, the "premium" charged by the reseller may not exceed 25% of the "established price" (the price printed on the ticket, not including taxes) or $5, whichever is greater.

140.    The premiums charged by Defendants in connection with the sale of the Winter Classic game tickets to Plaintiffs and members of the Class exceeded the allowable premium over the established price.

141.    Defendants' tying of the Alumni Game ticket, the Minor League Game tickets, and excessive "processing" charges as conditions precedent to the purchase of the Winter Classic game ticket was a disguised "premium" as defined by the Act.

142.    If a corporation, partnership or association violates the Act, any of its directors, members, agents or employees with knowledge of the crime may be convicted of a violation of the Act and subject to its penalties.

## CLASS ALLEGATIONS

143.    Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2) and 23(b)(3). The Class is defined as follows:

> All natural persons and entities residing in the United States who purchased from Defendants or any of them Philadelphia Flyers Full Season Ticket packages for the 2011-2012 National Hockey League season during the Class Period. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the sub-classes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

144.    Plaintiffs residing in the State of New Jersey bring this action on behalf of a sub-class of themselves and others similarly situated as follows:

> All natural persons and entities residing in New Jersey who purchased from Defendants or any of them Philadelphia Flyers Full Season Ticket Packages for the 2011-2012 National Hockey League season during the Class Period. Specifically excluded from this sub-class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this sub-class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

145. Plaintiff residing in the Commonwealth of Pennsylvania brings this action on behalf of a sub-class of himself and others similarly situated as follows:

> All natural persons and entities residing in Pennsylvania who, as consumers, purchased from Defendants or any of them Philadelphia Flyers Full Season Ticket Packages for the 2011-2012 National Hockey League season during the Class Period. Specifically excluded from this sub-class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this sub-class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

146. The exact size of the Class and sub-classes is information that is currently in the exclusive possession and control of Defendants. Due to the nature of the dispute, and the information currently available to them through discovery, Plaintiffs are informed and believe that the Class members are so numerous and geographically dispersed throughout the United States, that the joinder of all Class members is impracticable.

147. There were thousands of Full Season Ticket holders for the Flyers' 2011-2012 season.

148. There are questions of law or fact that are common to the claims of Plaintiffs and the Class members they seek to represent, including but not limited to:

> a. Whether Defendants offered and sold to Full Season Ticket Holders tickets to forty-four (44) Flyers home games for the 2011-2012 NHL season, but issued tickets for only forty-three (43) games;
>
> b. Whether, by offering and selling to Full Season Ticket Holders tickets to forty-four (44) games, but issuing tickets for only forty-three (43) games Defendants breached the contracts with the Class members;

   c.   Whether Defendants' mandatory requirement that Full Season Ticket Holders purchase tickets to the Alumni Game and the Minor League game in order to purchase a ticket to the Winter Classic game at an unfair and excessive price and unconscionable ancillary charges for processing fees, violated applicable consumer protection laws;

   d.   Whether Defendants' failure to credit or refund to the Class members the full and fair value of the Flyers – NY Rangers game ticket that Class members had purchased as part of the Full Season Ticket Package, but which Defendants withheld, violated applicable consumer protection laws;

   e.   Whether Defendant NHL Enterprises by entering into the Flyers-NHL Enterprises Agreement for the Winter Classic, wrongfully required the Flyers Defendants to withhold the game ticket previously sold to Plaintiffs and members of the Class, and

   f.   Whether the Defendant NHL Enterprises set the price at which the Plaintiffs and Class members could repurchase their tickets to the Winter Classic; and

   g.   Whether damages can be calculated based on a common methodology, and if so, what is the measure of damages.

149.   The questions of law and fact common to the members of the Class and sub-classes predominate over any questions affecting only individual members.

150.   Plaintiffs will fairly and adequately assert and protect the interests of the Class members.

151.   Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class they seek to represent.

152.   Defendants have acted in a manner that affects Plaintiffs and all members of the Class and sub-classes alike, thereby making appropriate declaratory relief with respect to the classes as a whole.

153.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.   The Classes are readily definable and are ones for which records exist in the business records of Defendants.

c.   Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.   Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.   Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate a breach of contract and consumer fraud claim such as are asserted in this complaint on an individual basis.

154.   This class action presents no difficulties of management that would preclude its maintenance as a class action.

155.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the

Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of other Class members or substantially impair or impede their ability to protect their interests.

156.    Plaintiffs are unaware of any other litigation commenced involving the same issues as are raised herein, with the exception of the matter, *Abt v. Comcast-Spectacor, L.P.*, Commonwealth of Pennsylvania, County of Montgomery, Magisterial District Justice Court No. 38-1-04, Docket No. 409-2011, which has concluded.

157.    Maintaining this litigation as a class action is the superior method of adjudication and is consistent with Rules 1 and 23.

158.    In view of the complexities of the issues and the expense of litigation, the separate claims of individual Class members are insufficient in amount to support separate actions, and the amount that could be recovered, while not insignificant, is so small relative to the complexity and administration of this litigation as not to justify class treatment.

<u>**COUNT I**</u>

<u>**BREACH OF CONTRACT**</u>

<u>**(Against All Defendants Except NHL Enterprises)**</u>

159.    Plaintiffs and members of the Class incorporate the above paragraphs as if fully set forth herein.

160.    Plaintiffs and members of the Class they seek to represent on the one hand, and Defendants on the other, are parties to the Agreement.

161.    Defendants breached their obligations to Plaintiffs and the members of the Class they seek to represent under the Agreement as alleged herein.

162.    As a result of Defendants' breach, Plaintiffs and the members of the Class suffered damages.

## COUNT II

## BREACH OF CONTRACT AND VIOLATION OF
## THE COVENANT OF GOOD FAITH AND FAIR DEALING

## (Against Defendants, except NHL Enterprises )

163.    Plaintiffs and members of the Class incorporate the above paragraphs as if fully set forth herein.

164.    Implicit in all contracts is the covenant of good faith and fair dealing.

165.    At all times relevant hereto, Plaintiffs and the members of the Class acted in good faith and yet, Defendants failed to act in good faith when rendering performance under the Agreement and/or by engaging in deception, and concealing and/or misrepresenting the parties' obligations and/or duties under the same.

166.    By reason of the conduct herein alleged, the Defendants have breached the covenant of good faith and fair dealing both as to Plaintiffs and the members of the Class.

167.    As a result of the Defendants' breach, Plaintiffs and the members of the Class suffered damages.

## COUNT III

## UNJUST ENRICHMENT

## (Against All Defendants)

168.    Plaintiffs and members of the Class incorporate the above paragraphs as if fully set forth herein.

169.    Although Plaintiffs maintain that they and the members of the Class had contracts with the Defendants (the "Agreement"), should it be found that no such contract existed between those parties, Plaintiffs seek relief under the common law theories of *quasi* contract and/or unjust enrichment and/or *quantum meruit*.

170.    Defendants obtained benefits from Plaintiffs and members of the Class.

171.    Defendants appreciated the benefits obtained.

172.    If Defendants retain the benefits that Plaintiffs and members of the Class conferred on Defendants without compensating Plaintiffs and the Class members therefor, Defendants will be unjustly enriched at Plaintiffs' and the Class members' expense. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class members have suffered damages and are entitled to a remedy.

173.    In light of the foregoing, Plaintiffs and members of the Class are entitled to damages from Defendants.

## COUNT IV

### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. 56:8-1, ET SEQ. (Against All Defendants)

174.    Plaintiffs and members of the New Jersey sub-class incorporate the above paragraphs as if fully set forth at length herein.

175.    Plaintiffs and members of the New Jersey sub-class are "persons" as defined by N.J.S.A. 56:8-1(d).

176.    Defendants are "persons" as defined by N.J.S.A. 56:8-1(d).

177.    The sale of the Full Season Ticket Packages by Defendants was the "sale" of "merchandise" as defined by N.J.S.A. 56:8-1(e) and (c), respectively.

178.   The Defendants attempted directly or indirectly by publication, dissemination, solicitation, endorsement, circulation and in other ways to induce directly or indirectly the Plaintiffs and the members of the New Jersey sub-class to enter into obligations with Defendants to purchase Full Season Ticket Packages, thereby engaging in the practice of "advertisement" as defined by N.J.S.A. 56:8-1(a).

179.   As of January 2011, Defendants knew or had reason to know they would be hosting the Winter Classic for the 2011-2012 NHL season.

180.   Despite Defendants' knowledge that they would be hosting the Flyers' January 2, 2012 regular season home game against the NY Rangers, Defendants made express offers to Plaintiffs and members of the New Jersey sub-class to sell the 2011-2012 Full Season Ticket Package, inclusive of all of the Flyers' forty-four (44) preseason and regular season home games, including the game against the NY Rangers.

181.   The Plaintiffs and members of the New Jersey sub-class accepted the Defendants' offers and entered into the Agreement with Defendants to purchase the Full Season Ticket Packages.

182.   Absent Defendants' uniform and false representation to Plaintiffs and members of the sub-class that they would receive the forty-four (44) tickets promised to them, they would not have entered into the Agreement with the Defendants.

183.   Defendants, without limitation:

a.   failed to disclose to Plaintiffs and members of the sub-class, before accepting payment from them, that Defendants had any right, intention, or grounds to exclude any ticket from the Full Season Ticket Package;

b.  failed to disclose to Plaintiffs and members of the sub-class, before accepting payment from them, that Defendants had any right, intention, or grounds to exclude any ticket from the Full Season Ticket Package on the basis that they would or could sell the very same ticket(s) to someone else;

c.  failed to disclose to Plaintiffs and members of the sub-class, before accepting payment from them that it intended to exclude any tickets from the Full Season Ticket Package;

d.  by their actions, were part of a plan or scheme not to sell the product as advertised;

e.  refused to deliver to Plaintiffs and members of the sub-class one of the forty-four (44) tickets, namely the ticket to the Flyers' January 2, 2012 Winter Classic game against the NY Rangers, the most valuable game of the season;

f.  only offered a credit/refund, and in a materially insubstantial, arbitrary, and deficient amount, of one forty-fourth (44th) of the amount paid for the Full Season Ticket Package, and/or not to deliver the entire package of tickets at the advertised price paid by Plaintiffs and members of the sub-class in violation of N.J.S.A. 56:8-2;

g.  offered a credit that could only be used toward the purchase of additional tickets from Defendants, the prospective cost of which substantially exceeded the value of the credit, and such that if the credit was not exercised it was to be forfeited to Defendants;

h.  offered a credit that could only be exercised if the Flyers qualified for the NHL playoffs;

i.  failed and refused to refund or credit any of the processing charges paid to them by Plaintiffs and members of the sub-class;

j.  misrepresented to Plaintiffs and members of the sub-class the illegitimate grounds for the refusal to provide the forty-fourth (44th) ticket to induce them into sitting on their rights and paying Defendants even more money;

offered to sell back to Plaintiffs and members of the sub-class, for amounts over and above what they already paid to Defendants for the Full Season Ticket Package, the forty-fourth (44th) ticket that Defendants wrongfully excluded from the Full Season Ticket Package;

k.  required Plaintiffs and members of the sub-class to pay more than the amount stated in the Agreement to obtain the forty-fourth (44th) ticket to which they were already entitled;

l.  required Plaintiffs and members of the sub-class to purchase tickets to two unrelated events having nothing to do with the Flyers, as a condition to obtaining the forty-fourth (44th) ticket;

m.  required Plaintiffs and members of the sub-class to pay unearned, excessive and arbitrary processing charges, as a condition to obtaining the forty-fourth (44th) ticket;

n.  required Plaintiffs and members of the sub-class to acquire the forty-fourth (44th) ticket through a website that was designed to confuse and deceive them; and

o.  required Plaintiffs and members of the sub-class to pay amounts that violate the Pennsylvania Resale Amusement Ticket Law.

184.    Further, the Defendants' failure to issue the forty-fourth (44th) ticket or refund the value of the withheld ticket to the Plaintiffs and the members of the New Jersey sub-class was a violation of N.J.S.A. 56:8-1, *et seq.*

185.    Further, Defendants' unilateral imposition upon Plaintiffs and the members of the New Jersey sub-class the requirement that they pay excessive prices, fees and costs to attend the forth-fourth (44th) game, i.e., the Winter Classic, and purchase tickets to the Alumni Game and Minor League Game, otherwise Defendants would withhold the ticket to the January 2, 2012 game, was a violation of N.J.S.A. 56:8-1, *et seq.*

186.    As a result of Defendants' misconduct, including their acts, concealments, misrepresentations and omissions of material facts in connection with the sale of Full Season Ticket Packages, Winter Classic tickets and amenities, Plaintiffs and members of the New Jersey sub-class suffered an ascertainable loss of money or personal property.

## COUNT V

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT, 73 PA. CONST. STAT. §§ 201.1 ET SEQ.
### (Against All Defendants)

187.    Plaintiffs and members of the Pennsylvania sub-class incorporate the above paragraphs as if fully set forth herein.

188.    Plaintiffs and members of the Pennsylvania sub-class are "persons" within the definition of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Const. Stat. §§ 201.1 *et seq.*

189.    Defendants engaged in "trade" and "commerce" within the definition of the UTPCPL.

190.    Defendants engaged in "unfair or deceptive acts or practices" within the definition of the UTCPL.

191.    Plaintiffs and members of the Pennsylvania sub-class purchased goods or services from Defendants primarily for personal, family or household purposes.

192.    Absent Defendants' uniform and false representation to Plaintiffs and members of the sub-class that they would receive the forty-four (44) tickets promised to them, they would not have entered into the Agreement with the Defendants.

193.    Defendants engaged in fraudulent and deceptive conduct, and caused a likelihood of confusion and misunderstanding within the definition of the UTPCPL when they, without limitation:

      a.   engaged in a scam designed to provide them with a windfall at the cost and expense of Plaintiffs and members of the Pennsylvania sub-class;

      b.   engaged in a scheme to deprive Plaintiffs and members of the Pennsylvania sub-class of the value of their Full Season Ticket Packages;

      c.   failed to disclose to Plaintiffs and members of the Pennsylvania sub-class, before accepting payment from them, that Defendants had any right, intention, or grounds to exclude any ticket from the Full Season Ticket Package;

      d.   failed to disclose to Plaintiffs and members of the sub-class, before accepting payment from them, that Defendants had any right, intention, or grounds to exclude any ticket from the Full Season Ticket Package on the basis that they would or could sell the very same ticket(s) to someone else;

e.  failed to disclose to Plaintiffs and members of the Pennsylvania sub-class, before accepting payment from them, that they intended to exclude any tickets from the Full Season Ticket Package;

f.  represented to Plaintiffs and members of the Pennsylvania sub-class that they could sell and/or had a right to sell to them the tickets that they offered to sell in the Agreement;

g.  refused to deliver to Plaintiffs and members of the Pennsylvania sub-class, after taking payment, one of the forty-four (44) tickets, namely the ticket to the Flyers' January 2, 2012 Winter Classic game against the NY Rangers, the most valuable game of the season;

h.  only offered a credit/refund, and in a materially insubstantial, arbitrary, and deficient amount, of one forty-fourth (44th) of the amount paid for the Full Season Ticket Package, and/or not to deliver the entire package of tickets at the advertised price paid by Plaintiffs and members of the Pennsylvania sub-class;

i.  offered a credit that could only be used toward the purchase of additional tickets from Defendants, the cost of which substantially exceeded the value of the credit;

j.  orchestrated a scheme to cause Plaintiffs and members of the Pennsylvania sub-class to forfeit their credits to Defendants;

k.  offered a credit that could only be exercised if the Flyers qualified for the NHL playoffs;

l.  failed and refused to refund or credit any of the processing charges that were charged as part of the Agreement;

m.  misrepresented to Plaintiffs and members of the Pennsylvania sub-class concocted grounds for their refusal to provide the forty-fourth (44th) ticket to induce them into sitting on their rights and submit to their deceptive scheme;

n.  offered to sell back to Plaintiffs and members of the Pennsylvania sub-class, over and above what they already paid to Defendants, the forty-fourth (44th) ticket that Defendants wrongfully excluded from the Full Season Ticket Package;

o.  required Plaintiffs and members of the Pennsylvania sub-class to purchase tickets to the Alumni Game and Minor League Game, two unrelated events having nothing to do with the Flyers, as a condition to obtaining the forty-fourth (44th) ticket for which Plaintiffs and members of the Class already paid;

p.  required Plaintiffs and members of the Pennsylvania sub-class to pay unearned, excessive and arbitrary processing charges as a condition to obtaining the forty-fourth (44th) ticket;

q.  required Plaintiffs and members of the Pennsylvania sub-class to acquire the forty-fourth (44th) ticket through a website that was designed to confuse and deceive them; and

r.  charged Plaintiffs and members of the Pennsylvania sub-class amounts that violate the Pennsylvania Resale Amusement Ticket Law.

194.  In violation of the UTPCPL, at the time Defendants solicited Plaintiffs and the members of the Pennsylvania sub-class, they had no reasonable basis to expect that it would be able to deliver and/or ship all forty-four (44) tickets to Plaintiffs and members of the sub-class.

195.    In violation of the UTPCPL, at the time Defendants solicited Plaintiffs and the members of the Pennsylvania sub-class, they had no intention to ship all forty-four (44) tickets to Plaintiffs and members of the sub-class.

196.    The Agreement fails to state any time that the Defendants expected or had a reasonable basis to expect they would be able to deliver and/or ship all forty-four (44) tickets to Plaintiffs and members of the Pennsylvania sub-class.

197.    In violation of the UTPCPL, to the extent Defendants may have extended credit to Plaintiffs and members of the Pennsylvania sub-class for the purchase of the Full Season Ticket Package, it did not deliver and/or ship any of the tickets within fifty (50) days of receipt of the orders received by Plaintiffs and members of the sub-class.

198.    As a direct and proximate result of the Defendants' violations of the UTPCPL herein alleged, the Plaintiffs and the members of the Pennsylvania sub-class have suffered an ascertainable loss of money or property, and have suffered damages.

199.    As a result of the Defendants' misconduct, fraud and deception, Plaintiffs and members of the Pennsylvania sub-class suffered damages which were a direct and proximate result of Defendants' violations of the UTPCPL.

200.    As a result of Defendants' misconduct, including their acts, concealments, misrepresentations and omissions of material facts in connection with the sale of Full Season Ticket Packages, Winter Classic tickets, and amenities, Plaintiffs and members of the Pennsylvania sub-class suffered an ascertainable loss of money or personal property.

## COUNT VI

## INTENTIONAL INTERFERENCE WITH CONTRACT;

## INDUCING BREACH OF CONTRACT

### (Against NHL Enterprises only)

201.    Plaintiffs and members of the Classes incorporate the above paragraphs as if fully set forth herein.

202.    During negotiations, and at the time NHL Enterprises finalized the NHL Enterprises-Flyers Agreement with the Flyers to hold the Winter Classic, NHL Enterprises knew that the Flyers had already sold or committed to sell to Plaintiffs and the Class the Full Season Ticket packages, each of which, pursuant to the Agreement, was expressly supposed to contain 44 tickets.

203.    Despite NHL Enterprise's knowledge of the Agreement, NHL Enterprises entered into the NHL Enterprises-Flyers Agreement with the Flyers and set the prices for the Winter Classic tickets at prices higher than those set forth in the Agreement between the Flyers and Plaintiffs and the Class.

204.    In entering into the NHL Enterprises-Flyers Agreement, NHL Enterprises intentionally and wrongfully interfered with the Flyers Defendants' performance of their Agreements with Plaintiffs and the Class to provide to Plaintiffs and the Class the ticket to the Rangers and Flyers January 2, 2012 game.

205.    In entering into the NHL Enterprises-Flyers Agreement, NHL Enterprises intentionally procured the Flyers' breach of their Agreements with Plaintiffs and the Class to provide to Plaintiffs and the Class the ticket to the Rangers and Flyers January 2, 2012 game.

206.    NHL Enterprises had no justification or privilege to interfere with the Agreement between the Flyers and Plaintiffs and the Class.

207.    NHL Enterprises' interference with the Flyers' Agreement with Plaintiffs and the Class members was improper.

208.    NHL Enterprises' inducement of the Flyers' breach of their Agreement with Plaintiffs and the Class was improper.

209.    As a result of NHL Enterprises' interference with the Flyers Defendants' ability to perform their Agreement with Plaintiffs and the Class members, Plaintiffs and the Class members suffered damages.

210.    As a direct and proximate cause of NHL Enterprises' inducement of the Flyers' breach of their Agreement with Plaintiffs and the Class members, Plaintiffs and the Class members suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class, including the sub-classes;

B.    That the Court enter judgment against Defendants in favor of Plaintiffs and the Class and sub-classes and that the conduct alleged herein be adjudged and decreed to be:

i.    Breach of contract as set forth in the First Count;

ii.    Breach of contract by reason of the breach of the covenant of good faith and fair dealing as set forth in the Second Count;

        ii.     Acts of unjust enrichment as set forth in the Third Count;

        iii.    Violations of the state consumer protection laws identified in the Fourth and Fifth Counts;

        iv.    Intentional interference with contract; Inducing Breach of Contract by NHL Enterprises as set forth in the Sixth Count;

C.     That the Plaintiffs and the Class and sub-classes alleged herein recover damages to the maximum extent allowed under such causes of action as are alleged herein and that a joint and several judgment in favor of Plaintiffs and the Class and sub-classes be entered against the Defendants in a multiple amount of their damages, including up to treble damages, as permitted or required by law, and punitive damages;

D.     That the Court award Plaintiffs and the Class and sub-classes their attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted or required by law and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

E.     That Defendants and NHL Enterprises, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein, or from entering into any other such conduct having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

F.      That Plaintiffs and members of the Class and sub-classes be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unjust enrichment; and

G.      That the Court award Plaintiffs and the Class and sub-classes such other and further relief as may be deemed meet and just.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues properly triable thereto.

Dated:  April 10, 2013                         STERN & EISENBERG, P.C.


                                               By:   /s/Evan Barenbaum


Dated:  April 10, 2013                         MESSINA LAW FIRM, P.C.


                                               By:   /s/Gil Messina


Dated:  April 10, 2013                         MINAMI TAMAKI LLP


                                               By:   /s/Derek Howard
                                                     *Attorneys for Plaintiffs Joyce Phillips,*
                                                     *Gary Mengle, John Bakley and the Putative Classes*


(ADDITIONAL COUNSEL CONTINUED)

GIL D. MESSINA, ESQ.
Email: gmessina@messinalawfirm.com
TIMOTHY A. C. MAY, ESQ.
Email: tmay@messinalawfirm.com
**MESSINA LAW FIRM, P.C.**
961 Holmdel Road
Holmdel, New Jersey 07733
Telephone: (732) 332-9300
Facsimile: (732) 332-9301

JACK W. LEE, ESQ.
Email: jlee@minamitamaki.com
DEREK G. HOWARD, ESQ.
Email: dhoward@minamitamaki.com
GLICEL SUMAGAYSAY, ESQ.
Email: gsumagaysay@MinamiTamaki.com
**MINAMI TAMAKI LLP**
360 Post Street, 8th Floor
San Francisco, CA 94108
Telephone:  (415) 788-9000
Facsimile:  (415) 398-3887
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs
and the Putative Classes*